*New-Haven, July, 1821.*

Bean
*v.*
Atwater.

—◦✦◦—

## STOW *against* CONVERSE.

The plaintiff in an action for a libel, to which the general issue is pleaded, with notice of a justification, may, at the trial, abandon, *ore tenus*, any part of the libellous matter alleged in the declaration, and proceed upon the residue; after which the defendant will not be permitted to justify the libellous matter so abandoned.

A party, who would justify a charge, must justify it specifically, and cannot prove a charge of the same general nature, but distinct as to the particular subject.

Therefore, where the libellous matter alleged in the declaration charged the plaintiff with having set up and supported an infidel club, and with having seduced his early companions to join it; evidence that the plaintiff was an infidel, was held to be inadmissible to justify such charge.

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

So, where the libellous matter charged the plaintiff with having attempted, and but too successfully, to destroy all religious institutions, the defendant was precluded from shewing, in justification of such charge, that the plaintiff had denied the authenticity of the Scriptures, and had spoken of them in terms of ridicule and sarcasm; that he had made a profane prayer; and that he had proposed certain votes, and procured them passed, in an ecclesiastical society meeting, reflecting upon an act of the general assembly, " for the support of literature and religion," and upon the conduct of certain preachers, and the doctrines taught by them.

An innuendo cannot *extend* the meaning of words; its office being to direct the application of the true meaning to the subject, or if they will bear different meanings, to select and apply the proper one.

In justification of a charge against the plaintiff of having set up and supported an infidel club, the defendant, after introducing evidence to prove, that the *Ethosian* society, of which the plaintiff had been a member, was an infidel club, offered evidence to shew, that this was its *general character*: Held, that the last-mentioned evidence was inadmissible, first, because it was irrelevant to the point in issue, and secondly, because it was not of as high a nature as might be had.

Such evidence would be equally inadmissible for the purpose of mitigating damages.

To repel evidence, adduced by the defendant, to justify his charge against the plaintiff of having attempted to destroy all religious institutions, the plaintiff offered in evidence certain subscription-papers for the support of preaching, drawn up, circulated and subscribed by himself, accompanied with proof of his having paid the money subscribed: Held, that such evidence was admissible for the purpose for which it was offered.

A new trial having been granted, pursuant to the advice of this Court, (ante, *vol. 3. p.* 325—347.) the cause was again tried at *New-Haven, August* term, 1820, before *Hosmer*, Ch. J.

The defendant pleaded *not guilty,* and gave notice, as on the former trial, that he should offer evidence to prove the truth of the charges contained in the publication complained of. In opening the cause, the plaintiff omitted to read, and abandoned, the following words in the declaration, with the innuendoes explanatory of them : " Let those who have been compelled to pay their taxes to him, as collector of the national tax, speak of his fairness and impartiality in his exactions,—of the justness of his demands,—and of his fees of office."

The defendant offered witnesses to prove the truth of these charges. To the admission of this evidence the plaintiff objected, on the ground that after the abandonment made by him, such evidence was irrelevant; and the Judge accordingly rejected it.

The defendant, for the purpose of shewing that the plaintiff was an infidel, offered a part of a deposition of *Polly Augur,*

consisting of a question and answer, in these words: " What do you consider Mr. *Stow's* general character as to religion? *Answer.* I consider him an infidel, or an unbeliever." For the same purpose, the defendant offered other parol evidence, to prove, that the plaintiff was an infidel, at the time of the publication of the alleged libel. To the admission of the evidence thus offered, the plaintiff objected, insisting that his infidelity was not a matter in issue between the parties ; and the Judge being of this opinion, rejected it.

The defendant, to prove that the plaintiff had attempted to destroy all religious institutions, and particularly, the church, society and religious institutions of *Middlefield*, offered in evidence the depositions of *Alma Lyman* and *William Southmayd*. The former stated, " That she had sometimes heard the plaintiff speak against the authenticity of the Scriptures, and reason against them, but more frequently, in terms of ridicule and sarcasm ; and once, after saying something rather contemptuously of them, he said, with a good deal of emphasis, " Well, the Bible is good for something ; after it is worn out, it will do to use at the *little-house.*" *Southmayd's* deposition was as follows : "Some time between the years 1813 and 1815, the plaintiff, in a conversation at *Hinsdale's* corner in *Middletown*, in the presence of from ten to fifteen persons, remarked, that his mother-in-law, Mrs. *Coe*, had frequently talked to him upon the subject of praying in his family ; that at a particular time, being on a visit to his house to spend the night, she introduced the subject anew ; that he concluded to gratify the old lady, by praying ; and introduced his prayer, by telling the Lord, that he did not come in his own name, but in the name of mother *Coe*. She wanted him to pray for *her*. He said, he prayed, that the Lord would supply her with plenty of beef and pork in her cellar, that she might have abundance ; that she might have a plenty of wool and flax, for that mother *Coe* was fond of spinning and making cloth ; that she might have many other articles mentioned by the plaintiff, in abundance ; and that all her children might have those things, in abundance, especially son *Seth*. After he got through with the things of this world, he mentioned, that she might have a good seat in Heaven ; and that all her children might have the same, especially son *Seth*."

For the same purpose, the defendant, likewise, offered in evidence, the following votes, proposed by the plaintiff, and passed, by his procurement, at a meeting of the inhabitants of

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

the society of *Middlefield,* held on the 26th of *December,* 1816 :

"An act *for the support of literature and religion* having passed the legislature of *Connecticut,* purporting to appropriate a large sum to various denominations of Christians, for the support of the Gospel, by which the civil and religious rights of the citizens of *Connecticut* are deeply affected :—Therefore, we deem it proper, in a respectful manner, to express our opinions on the subject.

"*Resolved,* That the claim on the *United States,* pretended to be appropriated, is of a disputable nature. If it did not originate in opposition to the general government, it was not under their sanction, or their authority, but under the sanction and authority, and in the particular and private views, of this state only ; from which circumstance, it is probable, that little or nothing will be allowed to the state.

"*Resolved,* That a pretended appropriation, under such circumstances, tends to inlist personal feelings, from personal interests, and thereby create an opposition to the government of the *United States.*

"*Resolved,* That we think any appropriation of a disputed claim, thus circumstanced, is unwise and impolitic, to say the least. But when considered in connexion with the pretended purpose, namely, for the support of the Gospel, we want words to express our astonishment.

"Will the legislature of the enlightened state of *Connecticut,* under the pretence of supporting the Gospel, through a mistaken zeal, aid the secret views of individuals, and promote disaffection, discord, and contention? Will they establish a precedent, whereby some future legislature, not as honest or as candid, might grant a large sum of money to prop up a sinking administration, and a sinking establishment of religion? The time may come, when a wicked priesthood may connect themselves with the government of the state, and controul the legislature. Civil and ecclesiastical hypocrisy may league together ; and some future legislature may open the treasury for the purpose of corruption and iniquity : they may find themselves sinking into merited disgrace ; to prevent which, they may seize upon this precedent.

"*Resolved,* That in our opinion, all mankind have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences ; and that no power can or ought to be vested in any legislature, to establish any sect of religion, or to raise money from the people for the purpose,

or to appropriate any money raised from the people for the support of any sect or order of religion whatever; and that all laws or grants contravening this principle, are unconstitutional, arbitrary, and unjust.

New-Haven, July, 1821.

Stow
v.
Converse.

" *Resolved*, That although little or nothing has been granted, by the legislature, because little or nothing has been, or probably ever will be, received; yet we view the principle recognized in the act, as extremely dangerous to the civil and religious liberties of the people of this state; and that it is the duty, as well as the right, of the citizens, to express their pointed disapprobation of the measure."

" *Resolved*, That we are desirous of having the Gospel preached in our meeting-house in this society; and that, according to our understanding of the Scriptures, the Gospel is good news to mankind; it is " *good tidings of great joy, which shall be to all people.*" If the preachers of this Gospel should be sent to us by man, or any order of men, we view them, notwithstanding, as being sent of God, and we feel the importance of listening to their instruction, and we trust we are both able and willing, as may be needed, to contribute for the support of such preaching, according to the precepts of the Gospel. But when we find persons coming amongst us, under the sanction of any order of men, proclaiming, instead of the Gospel, their discoveries of God's secret decrees, whereby some part of mankind were created for the express purpose of eternal misery; and that, by the decree of God, for the manifestation of His glory, some men and angels are predestined to everlasting life, and others fore-ordained to everlasting death; we do consider such preachers, not as commissioned of God to preach, but as teaching for doctrines the commandments of men.

" *Resolved*, That we view such doctrines as wicked and ruinous, calculated to do no good, but much mischief. We do fear they have been the cause of much mental derangement, and some consequent suicide: and we cannot bid such preachers *God speed;* nor can we conceive how those, who profess to believe this doctrine, can employ themselves and their agents in urging mankind to resist this decree, so far as it relates to the fore-ordained.

" And whereas, such preachers have been sent into this society, by authority we know not from whom, professing and teaching this worst of all doctrines, we deem it proper to express our dislike and abhorrence of the principles, as being

totally repugnant to the Scriptures, and to our views of the Gospel :—

"*Resolved*, That our meeting-house may be open to any and all denominations of Christians, agreeably to our former vote, but that the missionaries of the description herein-before-mentioned, be considered as having the right to preach in the meeting-house only, at such times as it may not be needed by others.

"*Resolved*, That so far as any individuals of this society may differ from us in the belief of this doctrine of decrees, we are willing that they should enjoy their equal rights in the meeting-house, and that, in proportion to their numbers, they have the same right with us ; but that we do disapprove of the interference of the Domestic Missionary Society, who have no right to our meeting-house, or to dictate to us any creed whatever."

For the same purpose, the defendant, likewise, offered parol evidence, to prove, that the plaintiff asserted, in a conversation with a member of the church in *Middlefield*, that the Bible was untrue.

To the admission of all the evidence offered for this purpose, the plaintiff objected, on the ground that it was irrelevant to prove the point for which it was offered ; and the Judge being of this opinion, rejected it.

In the course of the trial, it was proved, that a debating society, called the *Ethosian* society, existed in *Durham*, from 1787 to 1793, of which the plaintiff was a member in the year 1790, and of which his brother, *Silas Stow*, and Col. *Elisha Coe*, were made members, upon his invitation. The defendant, after having introduced witnesses to prove that this society was an infidel club, engaged in propagating infidel principles, adduced witnesses to prove, that it bore the general character of an infidel society, in order to justify the averment in the declaration that it was an infidel club, and to shew, that the plaintiff was entitled to no damages on this charge, or if any, to nominal damages only. In the argument to the jury, the plaintiff contended, that this testimony was inadmissible, and prayed the Judge so to instruct the jury ; and he accordingly directed them to reject it from their consideration.

In the further progress of the trial, the plaintiff, for the purpose of repelling the charge that he attempted to destroy the religious institutions, as the defendant had asserted, offered in evidence certain subscription papers for the support of preaching, drawn up, circulated and subscribed, by himself, accom-

panied with parol evidence to shew, that he paid the money subscribed by him. To the admission of this evidence, the defendant objected, on the ground that it was irrelevant; but the Judge admitted it.

After verdict for the plaintiff, the defendant moved for a new trial, on the ground that the several decisions of the Judge above stated, were incorrect.

*Daggett* and *Staples*, in support of the motion, contended, 1. That the plaintiff could not preclude the defendant from proving the truth of any of the charges stated in the declaration, by abandoning that part of the declaration, on the trial. Such a proceeding would be equally novel in practice, and unreasonable in its operation. The defendant is obliged to come prepared to prove the truth of all the charges; and if he succeeds, he is entitled to his costs. If the plaintiff may abandon any part of his declaration, which he finds the defendant prepared to meet, he may harrass him at pleasure, and still have it in his power to protect himself from costs. The proper course would have been, for the plaintiff to move to strike out those charges in his declaration which he could not support, or which the defendant could justify; which would have been allowed only on payment of costs.

2. That the evidence offered by the defendant, to prove the plaintiff's infidelity, ought to have been received. The plaintiff complains, that the defendant has charged him " with having set up and supported an infidel club;" *meaning*, that the plaintiff had established and continued to maintain an infidel club, in which the plaintiff had denied, and continued to deny, the being of a God, and his holy attributes, and that the *Christian* religion is true, and to teach that the holy scriptures are not of divine authority. A more exact description of an infidel, could not have been given. Now, the defendant offers to prove, that this charge, in the sense ascribed to it by the plaintiff himself, is true. The defence meets the charge.

3. That the evidence offered by the defendant, to shew, that the plaintiff had attempted to destroy the religious institutions of the state, ought to have been received. The foundation, on which our religious institutions rest, is a belief in the authenticity of the scriptures, and a reverence for the doctrines and precepts contained in them. If you sap the foundation, you, of course, destroy the superstructure. In

*New-Haven,*
July,
1821.

Stow
*v*
Converse.

what way could this be done more effectually, than by speaking of the scriptures "in terms of ridicule and sarcasm?" What language could be better fitted to bring the Bible into contempt, than the grossly indecent expressions uttered in the presence of *Alma Lyman?* Prayer to God is not only a *support* of religious institutions, but is itself a *part* of them. It is a duty instituted by divine authority. But what conduct can be devised, tending more directly to prevent the proper exercise of this duty, and to render the ordinance of God *of none effect*, than the prophane mockery, testified to by *William Southmayd?* If any thing, it must be his own rehearsal of this impiety to a collection of people in the streets of *Middletown*, sworn to by the same witness. His declaration to a member of the church in *Middlefield*, that the Bible was untrue, was of the same tendency, and equally pertinent to the point in controversy. Has not the propagation of infidel sentiments a tendency to destroy our religious institutions? Have the writings of *Hume* and *Paine* had no such tendency? The votes of *Middlefield* were certainly aside from the proper business of an ecclesiastical society, engaged in promoting its best interests as a religious institution. They breathe a spirit hostile to all our religious institutions. Was not the man who penned them, and got them passed, engaged in destroying religious institutions?

4. That the evidence adduced by the defendant, to shew, that the *Ethosian* society bore the general character of an infidel club, ought to have been permitted to go to the jury. This evidence was proper, first, to make out the justification; and secondly, in mitigation of damages. On the first ground, it tended to *corroborate* the defendant's testimony, previously given, that the society was an infidel club, engaged in propagating infidel principles. That the defendant frequented a society of this character, and was one of its most active members, furnished, also, a fair presumption, that he was himself an infidel. Suppose a woman should bring an action of slander for an aspersion of her character for chastity; and the defendant should prove, that she had frequented a house, the general character of which was that of a brothel; would not this evidence tend to prove that she was unchaste? But on the other ground, *viz.* for the purpose of mitigating damages, the evidence in question was clearly admissible. The rule is now well settled, that any facts and circumstances, arising from the misconduct of the plaintiff, though not amounting to

the offence charged, which occasioned the speaking of the *New-Haven,* words, or afforded ground of suspicion of their truth, may be *July,* proved in mitigation of damages. *Knobell* v. *Fuller, Peake's Evid.* 287, 8. *append.* xcii. ——— v. *Moor,* 1 *Mau. & Selw.* *Stow* 285. *Earl of Leicester,* v. *Walter,* 2 *Campb.* 251. *Larned* v. *Converse.* *Buffinton,* 3 *Mass. Rep.* 553. *Anthon's N. P. Rep.* 185. *Starkie on Slander,* 456, 7.

5. That if the evidence offered by the defendant was properly rejected, clearly that adduced by the plaintiff, to shew, that he had subscribed and paid money for preaching, could not be received. If the plaintiff's declaring the Bible to be false ; if his speaking of it in terms of ridicule and sarcasm, and intimating that it was fit only for the vilest of purposes ; if his insulting his Maker, in a mock prayer, and afterwards rehearsing it in the streets ; and if his prostituting the business of an ecclesiastical society to the purposes of party politics, were acts having no tendency to destroy religious institutions ; then his subscribing and paying money for preaching had no tendency to repel a charge of destroying religious institutions. Besides, after the defendant had adduced unexceptionable evidence to prove the truth of the charge ; it would not discredit that evidence, to shew, that the plaintiff had, in one instance, or in a hundred instances, conducted differently. Would a party charged with having passed counterfeit bills, be permitted to prove, for the purpose of repelling evidence in support of the charge, that in other instances, he had passed genuine bills ? Few men are so bad as never to have done an innocent act. Further, it does not appear what the character of the preacher, or of his preaching, was. For aught that appears, the preacher might have been one procured by the plaintiff, for the purpose of aiding him in destroying the religious institutions of the state.

*N. Smith* and *R. I. Ingersoll,* contra, contended, 1. That the evidence offered by the defendant to prove the charge contained in that part of the declaration, which the plaintiff had abandoned, was properly rejected. This depends on the question, whether it was correct, as a point of practice, to allow the plaintiff thus to withdraw a part of his case from the consideration of the jury ; for if this was properly done, the charge no longer existed, and, of course, could not be justified. Upon *principle,* there is no reason why a plaintiff may not abandon a *part* of his case, as well as the whole of it. But

New-Haven,
July,
1821.

Stow
v.
Converse.

the practice is settled by *authority*. In *England*, it is a matter of course to permit the plaintiff to enter a *nolle prosequi* as to one of several counts, or a part of the same count, and to proceed to trial upon the other counts, or the other parts of the count. 1 *Wms. Saund.* 207. *b.* 207. *c.* In *Genet* v. *Mitchell*, 7 *Johns. Rep.* 120. decided by the supreme court of the state of *New-York*, the plaintiff abandoned the principal part of the libellous matter set forth in the declaration; and it was held, that it was competent for him so to do, provided the part relied on contained sufficient to sustain the action. The same course of proceeding was adopted, and sanctioned, in *Brooks* v. *Bemis*, 8 *Johns. Rep.* 455. This practice is productive of no hardship to the defendant; for by the plaintiff's abandoning a particular charge, the defendant is placed on as good ground as though he had succeeded in justifying it.

2. That the evidence offered to prove the plaintiff's infidelity was properly rejected as irrelevant; his infidelity not being a matter in issue between the parties. This point was decided on the former motion for a new trial in this case. 3 *Conn. Rep.* 344.

3. That the depositions of *Alma Lyman* and *William Southmayd*, the resolutions of the society of *Middlefield*, and the declarations of the plaintiff to a member of the church, were rejected with equal propriety. Had the infidelity or impiety of the plaintiff been in issue, some part of this evidence might have been relevant; but it did not conduce, in any degree, to prove an attempt to destroy the religious institutions of the state. If the plaintiff's infidelity and impiety were proved, it would not meet the charge. The evidence must correspond exactly with the charge, or the justification fails. You cannot justify a charge of certain *acts*, by proving certain *opinions*. This point, also, was decided, on the former motion. 3 *Conn. Rep.* 344, 5. The resolutions were, in every view, unexceptionable; being the mere expression, in decent language, of sincere opinions.

4. That the evidence offered by the defendant, to shew the general character of the *Ethosian* society, was properly excluded. For, in the first place, the general character of the *Ethosian* society was not in issue. The charge against the plaintiff, which the defendant attempted to justify, was not that the plaintiff was a member of a society possessing a certain character, but that he had set up and supported an infidel club. The plaintiff could not be answerable, in any way, for

the character of the society.   And if he were, it would be no

justification to the defendant.   Secondly, the fact that the
*Ethosian* society was an infidel club, could not be proved by
reputation.   The case is not within any rule dispensing with
direct evidence.   Thirdly, the evidence offered being irrele-
vant and improper in its nature, it could not be received to
mitigate damages.

5. That the defendant having introduced testimony to
prove, that the plaintiff had attempted to destroy religious in-
stitutions, and particularly in the society of *Middlefield,* it was
competent for the plaintiff, for the purpose of repelling such
testimony, to give in evidence the papers subscribed, and the
money paid, by him, for the support of religious institutions,
particularly in the society of *Middlefield.*   These acts of the
plaintiff were precisely the reverse of the acts imputed to
him.

HOSMER, Ch. J.   In delivering my opinion in this case, I
shall attend to the objections made to the determination of
the court below, as they are successively presented by the
motion.

1. The plaintiff's declaration contains the following words,
being a part of the libel on which his action is founded:
" Let those who have been compelled to pay their taxes to
him," (meaning the plaintiff) " as collector of the national
tax, speak of his" (meaning the plaintiff's) " fairness and im-
partiality in his" (meaning the plaintiff's) " exactions, of the
justness of his" (meaning the plaintiff's) " demands, and of
his" (meaning the plaintiff's) " fees of office."   This allega-
tion the plaintiff, at the trial, omitted to read, and openly re-
linquished and abandoned.   The defendant, notwithstanding,
offered testimony to prove the truth of the recited charge ;
and on the plaintiff's objection, it was rejected as irrelevant.

The motion of the defendant is founded on a supposed de-
ficiency of right in the plaintiff thus to withdraw from the con-
sideration of the jury, any averment in his declaration.   There
exists no doubt, that a plaintiff may select from a publication
comprising many injurious charges, such parts of them as he
pleases, and found his action on these alone.   On the same
principle, he is at liberty to enter a *nolle prosequi* to the whole
of his declaration, or to one of the counts contained in it, or
to part of a count.   1 *Tidd's Prac.* 629. 1 *Wms. Saund.* 207.
*c.* n. *In Wigglesworth* v. *Dallison,* 1 *Wms. Saund.* 207. *c.* n.
which was an action of trespass for taking and carrying

away hay, grass, and corn, a *nolle prosequi* was entered as to the hay and grass, and the plaintiff was permitted to proceed for the corn. This, in an action for a libel, cannot be productive of any inconvenience ; as the whole publication is in evidence, that the meaning and spirit of the charges pursued, may be perfectly understood. In the action before the court, it is unquestionably clear, that the plaintiff might have entered a *nolle prosequi* as to that part of the declaration abandoned at the trial ; and in that event, the defendant could not have been permitted to prove the truth of the facts withdrawn from consideration. These observations contract the enquiry to this point, *viz.* Whether a *nolle prosequi*, in the accustomed form, must be entered, or whether an abandonment may be made, at the trial, *ore tenus*, as was done in this case.

The case of *Genet* v. *Mitchell*, 7 *Johns. Rep.* 120., determined by the supreme court of the state of *New-York*, contains a precise answer to the proposed questions ; and is, in no material respect, distinguishable from those under discussion. It was an action for a libel, the declaration comprised three counts, the second of which was wholly abandoned at the trial. In the first and third counts, different parts of the libel were recited, and while the cause was proceeding, " The plaintiff's counsel, after some discussion, stated to the judge, that they abandoned all the libellous matter set forth in the declaration, except the second paragraph in the first count, which, it was alleged, charged the plaintiff with being a ' *spy* ' of *Buonaparte*, and except the charge in the last count, which affirmed, ' that the plaintiff had traitorously betrayed the secrets of his own government.' It was then submitted, on the part of the defendant, whether such an abandonment could be made by the plaintiff ; and the judge being of opinion that it might be done, the plaintiff's counsel declared, that he abandoned all the libellous matter, except as above mentioned ; upon which the evidence offered by the defendant, as to the other matters, was held irrelevant." It has been insisted at the bar, that the abandonment mentioned in the preceding case, and in *Brooks* v. *Bemis*, 8 *Johns. Rep.* 455. where the same mode of practice was resorted to, was by the entry of a *nolle prosequi* ; but this supposition is opposed to language the most precise and perspicuous, and has no imaginable foundation. The case of *Genet* v. *Mitchell* was brought before the supreme court for revision ; and it was there ob-

jected by the defendant's counsel, as it has been done here, that the plaintiff, after stating a variety of facts in his declaration as libellous, and when "the defendant comes prepared to meet the whole charge," could not be permitted to separate the facts, and rely on one distinct fact, when there might be a clear and complete justification of the whole taken together. But, the court unanimously affirmed the proceeding at *nisi prius.* "This cause (said *Yates*, J.) was tried under the qualified abandonment, as stated; to which objections have been raised in the argument. I consider the doctrine laid down in 1 *Wms. Saund.* 207. n. 2. as the law on the subject, and the exception is incorrectly taken. The course adopted by the plaintiff was proper; and, it was competent to him to abandon part of the libellous matter, in any count, provided the part relied on contained sufficient to sustain the action; and as evidence of this, the judge correctly admitted the whole publication containing the libellous matter." *Kent*, Ch. J., *Thompson*, J., and *Van Ness*, J., concurred in this opinion. The adjudication of a very respectable judiciary, then, furnishes a precedent, entirely applicable to the case before us.

Independent of authority, it is very apparent, that the administration of justice, could neither require nor admit the reception of the offered testimony. To allow the justification of a charge, which the plaintiff had abandoned, and which this fact had ceased to charge, would, at best, be a useless waste of time; and not improbably, might be perverted to an unauthorized purpose. Besides, the interests of justice are never duly regarded, when evidence, which ought to make no impression, is admitted.

It has been said, that on the abandonment of a part of the plaintiff's declaration, the defendant should have been allowed the costs to which he had been subjected, by the preparation made to repel the charge relinquished; and on this point, great stress has been laid.

I reply, in the first place, that the motion is only adapted to review the question, whether, if there be an abandonment of part of the declaration, the defendant can be permitted to justify the facts relinquished. The enquiry presented to the court, is, whether the testimony should have been received, and not, whether costs should have been paid.

If, however, the question concerning costs were regularly made, to render it of any avail to the defendant, it must be

*New-Haven,*
*July,*
*1821.*

*Stow*
*v.*
*Converse.*

assumed as a principle, that they always must be allowed, under any circumstances in which they may occur; as the motion supplies no materials on this subject, for the exercise of judgment. But to this proposition I cannot give my assent. Where a *nolle prosequi* is entered to the whole declaration, the defendant in *Westminster-Hall*, by virtue of the 8 *Eliz. c.* 2. *s.* 2. is entitled to his costs; *Cooper v. Tiffin*, 3 *Term Rep.* 511.; and I have no doubt, that the principle of common law, on which costs are allowed in our courts, is co-extensive. But, when the abandonment is of *part* of a declaration, leaving sufficient matter to sustain a recovery in his favour; it is difficult to discern a reason why the costs should not depend on the ultimate determination of the cause. If the defendant obtain a verdict, the allowance of his costs is an inseparable consequence; and if he do not, on what ground is it, that he should be placed in a more eligible condition than he would have been in, had the evidence offered by him been admitted, and the verdict been rendered against him? In this event, he would not be entitled to costs; and by clear analogy, he must be equally without rights in the case of a partial abandonment, and a verdict against him on the matter pursued. In *Genet* v. *Mitchell* the same claim might have been made; but it was unthought of, both by court and counsel.

That the abandonment of a part of the declaration while the cause was on trial, was a novelty in our practice, I readily admit; and so entirely a novelty, that this is the first time, in which, so far as I know, the practice has ever been resorted to. The same, I believe, must be affirmed, of the proceeding in *Genet* v. *Mitchell*. But, the inference attempted to be deduced from the premises, is unwarrantable. As the point was made, it was necessary to decide it; and had the determination been adverse to the right of abandonment, the novelty of the decision would have been the same. After all that has been said, it obviously must occur to every lawyer, on the first suggestion of the thought, that even the sanction of precedent, however ancient and uniform, is never conclusive on a point of practice. It was truly asserted by *Lord Mansfield*, in *Robinson* v. *Bland*, 1 *W. Bla. Rep.* 256. 264. that, " Where an error is established, and has taken root, upon which any rule of property depends, it ought to be adhered to, by the judges, till the legislature think proper to alter it; lest the new determination should have a retrospect, and shake many questions already settled: but the reforming of

erroneous points of practice can have no such bad consequen- *New-Haven,*
July,
1821.

Stow
*v.*
Converse.
ces; and therefore, they may be altered at pleasure, when
found to be absurd or inconvenient." Hence the suggestion
of novelty is of no weight, in respect of a matter of practice,
if the rule adopted is founded on substantial reasons.

2. The next evidence offered consisted of the deposition of
*Polly Augur,* and of the testimony of other witnesses, to show
that the plaintiff was an infidel; and on the objection, that the
plaintiff's infidelity was not a matter in issue, the offered testi-
mony was repelled. On this point, the court expressed a di-
rect opinion, when this case was before them on a former oc-
casion. As the subject, however, is again presented, I am
not unwilling to give it an attentive examination.

The sole object of testimony, is to ascertain the truth of
the several disputed facts or points in issue, on the one side
and on the other; and no evidence ought to be admitted to
any other point. *Phill. Ev.* 126. The parties, the one by
affirming certain facts, and the other by denying them, have
marked out the field of controversy; and they both come pre-
pared to contest those questions, and those only, which they
deliberately have selected for trial. To these they must be
strictly confined, or surprise, and consequent injustice, will be
the infallible consequence.

Is there, then, an allegation in the libel, which charges the
plaintiff with infidelity? If there is not, the parties have no
controversy on this point; and to admit testimony to prove it
would be to try a case not before the court. The only ex-
pression supposed to be of this description, with the innuendo
explanatory of its meaning, is in the following words: "Let
those of his" (meaning the plaintiff's) "early compansons,
who are yet living, and who are seduced to join an infidel club,
by him" (meaning the plaintiff,) "and others, set up and sup-
ported," (meaning that he, the plaintiff, with others, had es-
tablished within this state, and continued to maintain, an infi-
del club, or association, in which he, the plaintiff, by writing,
teaching, or advised speaking, had denied, and continued to
deny, the true God, and his government of the world, and had
denied, and continued to deny, the being of a God, and his
holy attributes, and that the christian religion is true, and to
teach that the Holy Scriptures of the Old and New Testament
are not of divine authority; and that the plaintiff had seduced,
and continued constantly to seduce, the early companions of
his the plaintiff's youth, and others, citizens of this state, to

join said club, and that he, the plaintiff, has taught and inculcated to such persons, whom he had thus seduced, and continued to teach them in said club, that the christian religion is not true, and that the Holy Scriptures aforesaid are not of divine authority,) " tell of his" (meaning the plaintiff's) " virtues." When analysed and stripped of its sarcastic form, the clause in the libel contains the following plain assertions, and nothing more : First, that the plaintiff, with others, set up and supported an infidel club ; and secondly, that he seduced his early companions to join it. This is all which the declaration comprises, containing even an allusion to the subject of infidelity. As the charge exclusively imports the institution of a club for the propagation of infidelity, and the seduction of youth to become members of it, it would not at all be met or justified, by proof, that the plaintiff was an infidel. Should the defendant succeed in establishing this reproach, it would not, in the minutest degree, bear on the slander before propagated ; but the sole charge, that the plaintiff had instituted an infidel club, and seduced his companions to become members of it, would remain equally false, and in force equally undiminished, as before. Proof that the plaintiff was an infidel, would justify an imptution, which the defendant had never directly made before the introduction of such testimony : and although highly reproachful, much less so, than the accusation contained in the libel. For I think it demonstrably clear, that to charge a person with infidelity, injurious as it must be, if unmerited, so long as it is understood that the poison is confined to his own bosom, is less aggravated and pernicious than the assertion, that he is actively engaged in propagating infidel principles ; although to this it were not superadded, that he is the seducer of his youthful companions. And this is an additional demonstration that the matters charged in the libel, and offered in justification, are not the same ; as they are not identical either in nature or degree. I will only add, that a charge of infidelity has for its object the want of religious faith ; while the allegation, that a person has instituted an infidel club, and seduced his companions to become members, has for its object, the actions of an individual ; and the difference is precisely this ; that the former is conversant about a mental operation only, while the latter relates exclusively to conversation and action. No person of common understanding would suppose, that the accusation of having congregated a band of murderers, would be justified, by proof,

*New-Haven.*
July,
1821.

Stow
*v.*
Converse.

that the man of whom the words were spoken, was sufficiently unprincipled to commit murder ; or that the denunciation of one as having perpetrated treason, would be evinced by testimony of his treasonable purposes.    The analogy between the cases put, and the principal case, is too obvious to require illustration.

It has been correctly asserted, that proof of the substance of a slanderous charge, is a justification ; and this is frequently followed, by the erroneous supposition, that every thing is substance, which justifies the matter alleged, or has a relation to the facts averred, although it does not meet them directly. In a case which demands the frequent application of the exact rule on this subject, it is of high importance, that it should be precisely understood.    The term *substance* is used by way of contradistinction, from the *letter* and *form* of a charge ; and although the latter is not required, the essence is indispensible.    It can never comport with private justice or public convenience that a libeller should be protected, by any proof, which falls below the imputations he has made.    The characters of men would be most inadequately guarded by a principle, that permits any thing to be a justification of libellous expressions not amounting to full proof of the essential facts charged ; and a court, which, in its requirements, should sink below this standard, would deserve nothing short of public censure.    And when the accusation, instead of specifying certain definite facts, which are clearly to be understood, and to confront which, the person claiming to be injured knows by what testimony to meet them, is expressed in terms so broad and general, as almost to defy preparation for this purpose, the rule cannot, with safety to the interests of justice, admit of any relaxation.    Were it otherwise, the press, which now often teems with gross licentiousness, might easily be made the vehicle of the most wanton reproach and vile calumny, without the possibility of correction ; and this palladium of liberty would thus become a hateful curse.

The established rule on this subject, is given, with much precision, in the case of *Andrews* v. *Vanduzer,* 11 *Johns. Rep.* 38. and it is this ; " that the defendant, who would justify a charge, must justify as to the specific charge laid, and cannot set up a charge of the same thing, but distinct as to the subject matter."—Thus in *Hilsden* v. *Mercer, Cro. Jac.* 677. the court adjudged the words, " She is a thief to you and to me, and hath stolen twenty pounds from me, and forty pounds

from you," were not justified, by a plea, which alleged, " that the plaintiff was a thief, and had stolen two hens." It was said, " that inasmuch as it is a justification, in that she was a thief, which are the principal words, the other words are not material to be answered to ; *sed non allocatur;* for the last words are as slanderous as the former ; and there was not any justification of them, nor answer to them, and therefore the plea is vicious." So in *Smithies* v. Dr. *Harrison,* 1 *Ld. Raym.* 727. which was an action on the case for words, that imported the committing of adultery by the plaintiff with *Jane* at *Stile;* it was determined by Lord *Holt,* that the defendant, in mitigation of damages, might give in evidence, that the plaintiff committed adultery with *Jane* at *Stile,* but not with any other woman. And in *Andrews* v. *Vanduzer* before mentioned, a determination to the same effect, has recently been made, by the supreme court of the state of *New-York.* The plaintiff brought an action of slander against the defendant for saying of him, that he had had an unnatural connexion with a *mare,* to which the general issue was pleaded, with notice ; and at the trial, the defendant offered to prove, that the plaintiff had been guilty of the above crime with a *cow.* The evidence was repelled, and the court said ; " The cases in *Cro. Jac.* 677. 1 *Ld. Raym.* 727. *Bull. N. P.* 9. show, that the defendant must justify the specific charge." In the case before us, the specific charge is, that the plaintiff instituted a club, and not that he is in principle an infidel.

It was contended, that the *innuendo* has varied the popular sense of the word, and explained the charge as denoting infidelity ; and on this point has rested the principal stress of the defendant's argument. Upon this subject there has been a double misconception; that is, a misconception both of the law and of the fact.

First, as to the law. An *innuendo* is not an averment, but is only matter of explanation; " For," as was said by *De Grey,* Ch. J. in *Rex* v. *Horne, Cowp.* 672. 684. " it means nothing more than the words " *id est,*" " *scilicet,*" or " *meaning,*" or " *aforesaid,*" as explanatory of a subject matter sufficiently expressed before ; as, such a one, *meaning* the defendant, or such a subject, *meaning* the subject in question. But as an innuendo is only used as a word of explanation, it cannot extend the sense of the expressions in the libel beyond their own meaning ; unless something is put on the record for it to explain." In *Roberts* v. *Camden,* 9 *East* 95. Lord *Ellen-*

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

*borough* said ; "Where such new matter is not, as here, necessary to support the action, an innuendo, without any *colloquium*, may well be rejected as surplusage ; as it can have no effect in enlarging the sense of the words used." Vide *Van Vechten* v. *Hopkins,* 5 *Johns. Rep.* 210. 220. 1 *Chitty on Plead.* 383. *Pelton* v. *Ward,* 3 *Caines,* 73. Although an innuendo can never enlarge the meaning of an expression, yet where words are ambiguous, and admit of different applications it may confine or direct them. This principle illustrated in the case of *Smith* v. *Carey,* 3 *Campb.* 460. In an action for slander of the plaintiff in his trade, the words were, "that he lived by swindling and robbing the public." To swindle, is to practice fraud ; and hence the expression had a very extensive sweep, and admitted of a justification by proof of fraudulent practices to the injury of others, in almost any possible manner. The plaintiff subjoined an innuendo to the words, meaning that he was guilty of "felony and robbery." It was correctly decided by *Lord Ellenborough,* that the plaintiff should be held to that sense of the words, which he had ascribed to them. This case shows the restrictive or limiting effect of an innuendo in certain cases, but does not countenance the idea, that it can ever extend the intendment of an expression beyond its customary meaning. This would be, to alter the nature of an innuendo, and convert an explanation of antecedent matter, into a direct averment. Now, if the words published of the plaintiff unequivocally and exclusively mean, the supporting of an infidel club, and seducing youth to join it, concerning which there exists not a serious question ; an innuendo, explaining them to charge the plaintiff with being an infidel, would be a nullity, by this attempt to enlarge the sense of definite and intelligible expressions. And what is particularly important on this subject, there is neither averment nor *colloquium* in the declaration, by reference to which, the words published are susceptible of a construction, different from their plain and popular signification.

Secondly, the misconception of fact is equally obvious. The innuendo does not explain the words, as having imputed infidelity to the plaintiff. It contains the following propositions, and nothing more. 1. That the plaintiff, with others, established within the state, and continued to maintain, an infidel club or association. 2. That in said club, he had denied the true God, and his government of the world, and continued to deny his being and attributes ; and the truth of the Chris-

tian religion; and to teach that the holy scriptures are not of divine authority.   3. That he had seduced his youthful companions and others to join the club, and taught them the above principles.   It is difficult to suppose, if the innuendo is supported, that the defendant did not believe the plaintiff to be an infidel; but he has made no charge of this description, and, therefore, he has no such charge to justify.   The innuendo merely amounts to the construction, which I have put on the words, and is a developement of their plain meaning.   The first part of it is a conversion into affirmative language, of what had been imputed in the libel, in an ironical form.   It then gives an actual description of an infidel club, by denoting its doctrines and pursuits.   And, lastly, it contains an explication of the expression, seduction of youth to become members.   The whole of the innuendo is conversant about the school, the instruction there imparted, and the manner in which persons were induced to join it.   No expression can be seized on, denoting directly that the plaintiff was an infidel; and instead of a charge to this effect, it merely comprises matter of probable presumption.

3. The next question arises, out of the following averment in the plaintiff's declaration: "Let the parish in which he" (meaning the plaintiff) "lives, speak his" (meaning the plaintiff's) "virtues, his" (meaning the plaintiff's) "attempts, and but too successful, to destroy all religious institutions in the state."   These words must be taken in that sense, in which they would be understood by those, who hear or read them. *Bull. N. P.* 4. *Roberts* v. *Camden,* 9 *East* 93.   What then, is their plain and popular sense? And what the imputation, meant to be conveyed? The questions are susceptible of but one answer.   In the expression of the libel there is nothing equivocal or ambiguous; and reduced to a plain affirmation, it contains the following charge, that the plaintiff had successfully attempted " to destroy all religious institutions."

The defendant declares this charge to be true; and has offered testimony to substantiate his assertion.   To ascertain the correctness or incorrectness of the decision below rejecting the offered evidence, it is necessary that the precise import of the charge be fixed; and then, that the effect of the testimony, be exactly determined.

The imputation on the plaintiff is, of " an attempt" to destroy religious institution; and coupled with the expression " but too successful," it plainly comprises an act, or designed

endeavour, that, at least, has been partially accomplished. By the attempt to do an act, I understand, an effort or endeavour to effect its accomplishment. This denotes something beyond the infidelity of an individual, or the declaration of his opinions, unless they are intentionally made the vehicle of effectuating some object. Between the attempt to accomplish a measure, and the tendency of conduct to produce its accomplishment, there is a broad line of discrimination, which, in the argument of this case, was not sufficiently regarded. It is the tendency of corrupt principles, often promulged, to subvert opinion, and in this way to shake institutions ; and equally so, of immoral conduct. Profane swearing, drunkenness and other vicious examples tend to undermine religious principles, for the same reason, that there is this tendency in declarations of infidelity, and in licentious conversation. But, no person, acquainted with the force of language, confounds the tendency of immoral example, or corrupt discourse, with an attempt to accomplish the objects, towards which they have a manifest direction. If infidel principles, casually promulgated, without any purpose to subvert institutions, constitute an attempt to destroy them, so do drunkenness, profanity, and other vices, because this is their tendency ; and the charge made on the plaintiff might as well be justified by one of these modes, as by the other. Of a person who had affirmed that the government ought to be destroyed, it would be a perversion of language to say, that he had attempted to destroy it ; or of another who had declared, arms ought to be resorted to, that he had levied war ; or of a third, who justified self-murder, that he had attempted to commit suicide ; or of a fourth, who had resolved to beat another, that he had attempted to commit a battery upon him. These, and an infinity of illustrations, occur to show the deep line of distinction, between an opinion and an attempt, speculation and practice, words and actions.

The fair test of this enquiry will be found, in the impression made on the minds of those, who read the publication of the defendant, by which there is imputed to the plaintiff, an attempt, not unsuccessful, to destroy religious institutions. Would it be believed, that the casual avowal of infidelity, to one, two, or three individuals, in a succession of years, was all that was intended ? Or that a speculation on a measure of government, or a denial of the doctrine of absolute decrees, was the foundation of so grave a charge ? I may safely answer in the negative. Undoubtedly, from the generality of

New-Haven,
July,
1821.

Stow
v.
Converse.

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

the accusation, some difficulty would be experienced, and different persons, probably, would entertain different conjectures relative to the censure intended ; but that some powerful and successful effort to destroy, had been made, would universally be believed ; and the obscurity shed over the subject, by the omission to specificate precise facts, would give a play to the imagination, and greatly deepen the horror and contempt, which an imputation so gross and undefined, could not fail to produce.

With the meaning, I have assigned to the word "attempt," which I am clear is the popular signification of the term, I shall proceed to enquire, whether the testimony offered and rejected, conduced to prove the specific charge made.

The evidence first offered to prove " an attempt but too successful" to destroy religious institutions, was the deposition of *Alma Lyman.* The only part of this testimony, which can be supposed to bear any relation to the matter in question, was to this effect; That about 16 or 18 years since, she sometimes heard the plaintiff speak against the authenticity of the scriptures, but more frequently in terms of ridicule, sarcasm, and great irreverence. The evidence offered, unquestionably conduced to prove infidelity, and this was its direct and immediate tendency; but it will not prove every thing. It had no bearing on the point, which it was offered to establish, as it was not an attempt to destroy religious institutions ; nor can I conceive that any person, on hearing the grave accusation advanced, would imagine that it was to be supported by such proof.

The next proposed evidence, was the deposition of *William Southmayd,* for the purpose of proving, that, at his own house, a few years since, the plaintiff, at the request of his mother-in-law to pray in his family, made a profane and irreligious prayer. If such a prayer was made, it undoubtedly is proof of gross impiety and irreverence ; but it was no attempt to destroy any religious institution, " and particularly, the church, society, and religious institutions of *Middlefield.*" No person, informed of the above facts, can, with any propriety of language, characterise them as an attempt to subvert the institutions of religion ; unless the same character is applicable to profanity and wickedness of every description. The parent, who, in the presence of his children, should blaspheme the name and attributes of the Deity, would commit an offence, the enormity of which it would be difficult to express ; but who would denominate such conduct, an attempt to destroy religious institutions ? I confidently answer, no person,

unless he were prepared to ascribe the same denomination to every species of impiety.

To prove an attempt of the plaintiff to destroy religious institutions, the defendant offered in evidence two votes of the ecclesiastical society in *Middlefield*, proposed by the plaintiff, and passed by his procurement. One of them related to the act of the general assembly, making an appropriation of the debt due from the *United States* to this state, for the support of literature and religion; and the other amounted to a protest against the reception of clergymen, sent to *Middlefield*, by the Domestic Missionary Society, who inculcated the doctrine of absolute decrees; a doctrine believed by a majority of the society, to be unscriptural. I am not called on to express my opinion, respecting the solidity and correctness of the observations contained in the votes, nor concerning the propriety of directing the acts of the society to such purposes. The sole question before the court, is, whether they conduce to prove an attempt to destroy religious institutions. I am of the opinion that they furnish no evidence directed to this point. The former vote, most obviously, considered the act of the legislature, in making an appropriation to the various religious denominations, as a measure merely political; that it was unwise, impolitic, and, under the pretence of supporting the gospel, which was no part of the real object, promotive of disaffection, discord, and contention; that it was a pernicious precedent, intended to prop up (to use the expression of the vote) "a sinking administration, and a sinking establishment of religion." No objection was expressed in the vote, against religious institutions; on the contrary, it declares, that "all mankind have a natural and unalienable right to worship Almighty God, according to the dictates of their consciences; but that no power can or ought to be vested in any legislature to establish any sect of religion." The vote is full evidence, that in the opinion of the plaintiff, it was not competent for the legislature to support the government, by the aid of a religious establishment, nor to dissipate the public wealth, under false pretences, and with personal views. Whatever errors are contained in the vote, (concerning which I intimate no opinion) it had no tendency, much less was it an attempt, to subvert any of the religious institutions of our country.

As to the vote in reprobation of absolute decrees, the *vexata questio* of divines and others, from the reformation to this time, on which different churches have entertained, and do

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

*New-Haven,*
July,
1821.

Stow
*v.*
Converse.

entertain, different opinions, and which, like the question of liberty and necessity in the schools, has been a perpetual theme of controversy, there is no reasonable pretence for asserting, that it was an attempt to prostrate religious institutions. These subjects cannot be identified. I do not sit in the theological chair; and feel no disposition to express an opinion, on the sentiments contained in the vote. But so long as the bible is allowed to be the religion of protestants, mankind must be free honestly to form and publish their own opinions on subjects of the most interesting nature, without censure or controul. I deeply regret, that in this age of religious freedom, it should ever have occurred to any one, that an expression of belief, however erroneous, on a disputed point of doctrine, in the respectable churches of this state, was an attempt to subvert religion; and what is more extraordinary, that a court of law should be called on to prescribe bounds to theological discussion.

The last evidence offered to prove, that the plaintiff had successfully attempted to destroy religious institutions, was an assertion said to be made to a member of the church in *Middlefield,* that the bible was untrue. To establish infidelity, the testimony would be admissible, but on the point to evince which it was adduced, it had no bearing.

4. The defendant having introduced testimony to prove the *Ethosian* society, to be an infidel club, exhibited evidence to show, that this was its general character; but the jury were directed to discard it from consideration.

The correctness of this decission depends on the legal result of two enquiries; the first, as to what the defendant is bound to prove; and the second, in what manner the proof is to be made.

First, the defendant has undertaken to prove, and on this rests his justification, that his representation concerning the *Ethosian* society was true. He affirmed it to be *an infidel club,* set up and supported by the plaintiff; and the proof, to be of any avail, must be coextensive with his affirmation. Had he thought proper, he might have said, that the plaintiff instituted a society, *reputed* to be an infidel association; and then the issue would have been, not on what it really was, but on the *reputation* it bore. Not confining himself to these limits, he has directly asserted, that it was " an infidel club;" and in this, as well as in every other instance of injurious representation, he must be held to support the specific charge.

In other words, he must be confined in his proof to the is- *New-Haven,* July, 1821.
sue.

Stow *v* Converse.

Secondly, the evidence on this point, as on all others, is governed by certain general principles. Every allegation must be established in a court of justice, by the testimony of a witness or witnesses acquainted with the facts put in issue, and sworn to speak from knowledge, and not from hearsay. *Phill. Ev.* 173. To the above rule there are few exceptions, resting on the reason, that the nature of the case admits of the procurement of no better testimony. It has not been, and cannot be pretended, that the constitution and objects of the above named society, from their nature, are incapable of the ordinary proof; but on the contrary, the defendant has adduced the testimony of particular facts, to establish its purposes and proceedings. The question between the parties must turn on this point; whether the character of the *Ethosian* society is in issue; and that it is, no one will affirm, unless issue can be formed, when there has been no affirmation of a fact on the one side, or denial of it on the other, nor any thing in the nature of the proceedings to raise the proposed question.

It has been insisted, although the proof repelled would not justify the defendant, that it was admissible in mitigation of damages; but this proposition I cannot admit, and for two distinct reasons.

First, the character of the *Ethosian* society must be in issue, directly or collaterally, or the parties do not come prepared to try this question. It has been correctly said (*Phill. Ev.* 139.) " as evidence is confined to the points in issue, the character of either party cannot be inquired into, in a civil suit, unless put in issue by the nature of the proceedings itself." Although it has been questioned, whether in an action for libel, the defendant may give in evidence, under the general issue, the plaintiff's character in mitigation of damages; (*Foot* v. *Tracy,* 1 *Johns. Rep.* 46.) I entertain no doubt as to the admissibility of such testimony. " The character of the plaintiff," said Ch. J. *Kent,* 1 *Johns. Rep.* 52, 3. " must be considered as coming in, at least, collaterally, upon the trial," " and the injury to it is the *gravamen* complained of." The plaintiff's character is the principal object attacked; and for the vindication of this specific injury, his suit is instituted; and in proportion to the fairness of his reputation, are the damages sustained. Hence, he comes prepared to support

his character, in order to deepen the proof of injury ; and the defendant, likewise, to protect himself from excessive damages, makes his preparation, to reduce to its proper standard that reputation, which the parties, by their pleadings, have made an interesting question between them. Evidence concerning the reputation of a specific fact, which the defendant has published of the plaintiff, not as being its character, but as actually existing, and which is in issue as a fact, and not as character, does not fall within the preceding rule. The reputation of the fact is not in issue ; but the only issue is, Whether the precise fact existed. On this point there has not been an accurate discrimination. The plaintiff's character may be proved, because it is in issue ; but the character of the *Ethosian* society may not be proved, because it is not in issue. And at least, before I can yield my assent to the admission of the offered evidence, I must demand some well established principle, or decided case, which countenances a doctrine, apparently so unwarrantable.

Secondly, if I could admit an absurdity so gross, as that testimony to a fact not in issue might be received, I, at least, should require, that the evidence would mitigate the damages. The plaintiff is charged with having set up and supported an infidel club ; and for the purposes of this inquiry, it must be admitted, either that he did not institute or support it, or that the assertion of its being infidel, was false and malicious. For, if he, in fact, supported the society, and it, in fact, was a club of infidels, the defendant would be fully justified in his publication. Now, take either part of the alternative presented ; that is, that the plaintiff did not set up or support the society, or that it was a society directed, exclusively, to moral and literary purposes. In the former event, to wit, that the plaintiff had no connexion with the society, proof of its character would clearly be irrelevant. And in the latter case, namely, that, although he supported it, it was a good and praise-worthy institution, I cannot conceive, that the false character of the society, ought to diminish the damages. And let it not be forgotten, that the most accumulated proof of character, would never authorise the jury to find, as a fact, that the society was a club of infidels. The plaintiff would not sustain less damage, by reason of the character of the institution ; but the proneness to believe it to be unworthy and pernicious, would deepen the injury, by stamping probability on the false and malicious publication. And I most cordially

embrace the observations of a learned judge, in *Foot* v. *Tracy*, 1 *Johns. Rep.* 51., as applicable to the point under consideration. " Those who sport with the feelings of others, under the professions of zeal for public good, on no other basis than that of common fame, which is not always an infallible guide, cannot complain, if courts require from them on these, as on most other occasions, some better proof of their calumnies than general opinion."

<div align="right">

*NewHaven,*
July,
1821.

Stow
*v.*
Converse.

</div>

5.   To repel the charge made on the plaintiff, that he had attempted to destroy all religious institutions, he offered in evidence, certain subscription papers for the support of preaching, drawn up, circulated, and subscribed by himself, and accompanied with parol testimony to show, that he paid the money subscribed.   To the relevancy of this evidence the court overruled an objection, and admitted it.

Why should not the testimony have been received ?   The defendant had exhibited evidence to prove, that the plaintiff had attempted to destroy all religious institutions ; and in opposition to this, should not the plaintiff be permitted to show, that he had habitually supported them, and in this manner, disprove the defendant's testimony ?

The evidence, then, was unquestionably proper, if it tended to establish the point, for which it was adduced ; and that it did, is manifest, unless he who promotes the preaching of the gospel, by his property and exertions, does not support a religious institution ; a position, that no man of sound mind will advance.

On the best view I have been able to give the whole subject, no error has intervened ; and a new trial ought not to be granted.

The other Judges were of the same opinion.

<div align="center">

New trial not to be granted.